Plaintiff's total employment experience as an adult has consisted of work with her hands in nothing other than the clothing manufacturing business.
The Deputy Commissioner and majority gave greater weight to the opinions of Drs. Young and Lacin than to the opinions of Drs. Powell and Epling in finding that that the trim and examine inspector position was suitable employment. This factual finding is not supported by the greater weight of the credible evidence.
In 1987, the plaintiff began her employment with Brooks Brothers as a "trim and examine inspector". At the Brooks Brothers' plant in Sampson County, the job of "trim and examine inspector" that the plaintiff performed for most of the entire 10+ years of her employment by Brooks Brothers before her injury date of August 7, 1997 required her to perform hundreds of only one or two types of highly repetitive motions with her hands per eight-hour work shift. On this point, the plaintiff's testimony about the highly repetitive motions required by her job was supported by the videotape of the plaintiff's job that was viewed in its entirety by Dr. Carol Epling, M.D., and the opinions of both Drs. Epling and Dr. Young.
When the plaintiff performed her job as a "trim and examine inspector", she engaged in the repeated and regular grasping or pinching every few seconds with both of her hands to snip the excess threads from the shirts she was working with, or to remove the inspection stickers from those shirts. When she performed that job, the plaintiff had an extra incentive to work her hands as quickly as possible because she was compensated in part on a piece rate basis based upon the number of units of shirts that the plaintiff was able to trim and inspect (base level hourly rate required production of 28.8 dozen shirts per shift in 1997). Indeed, the unrebutted testimony of one witness for the plaintiff was that the defendant employer really required every employee to make 100% of the base hourly rate by production or face termination of employment.
In February, 1997, plaintiff began to complain to Dr. Powell of pain, numbness, weakness, and tingling in her fingers, thumbs, and hands. Based upon those symptoms, and his general knowledge of the type of work that the plaintiff was performing at that time, Dr. Powell referred the plaintiff to Dr. Patel for NCV studies that were performed on February 26, 1997. Dr. Patel and Dr. Young both interpreted those NCV study results to as "abnormal nerve conduction velocity study suggestive of bilateral median neuropathy; carpal tunnel syndrome".
Then, in March 1997, the plaintiff began a course of conservative treatment with Dr. Powell and Dr. Paul M. Carter, M.D., a local orthopedist, for that condition which included splints and steroid shots. That course of conservative care continued through September 1997, but it was not successful in alleviating plaintiff's symptoms. On August 7, 1997, the plaintiff became disabled from work, and began to receive temporary total disability indemnification payments from the defendants pursuant to a Form 60. In October, 1997, she was referred to Dr. Richard L. Young, M.D. for a surgical evaluation at the direction of Lynn Valenti, the Claims Case Manager for the carrier in this case.
The plaintiff's exposure at Brooks Brothers to this repetitive work with her hands significantly increased the risk of the plaintiff's contracting an occupational illness in the form of bilateral carpal tunnel syndrome in one or both of her hands. Dr. Epling specifically opined that this was the case . . . Dr. Epling also testified that her opinion was, in part, based upon her view that the "cyclical" work performed by the plaintiff that she reviewed in the videotape prepared by the defendants was "highly repetitive upper extremity work". She also testified that plaintiff's performance of that work significantly contributed to the development of bilateral carpal tunnel syndrome in the plaintiff's wrists. One of the plaintiff's treating physicians, Dr. Young, also opined that the bilateral carpal tunnel syndrome condition that he treated the plaintiff for beginning in October 1997 was a "work related condition." That opinion was based, in part, upon his "strong disagreement" with the opinion expressed by Dr. Lacin that the plaintiff's work as a trim and examine inspector was not a "repetitive motion type of job".
At the hearing on January 11, 1999, the defendants did not appear to contest these causation findings by Drs. Epling and Young. Indeed, the record reflects that on January 7, 1998, the defendants filed a Form 60 with the Commission dated January 6, 1998 in which they admitted the compensability of the plaintiff's bilateral carpal tunnel syndrome from August 7, 1997.
During the time period that she was treated by Dr. Young, Dr. Young performed right carpal tunnel release surgery on the plaintiff on October 29, 1997. Dr. Young testified that he observed a "thickening of the ligament" in the right carpal tunnel which was "consistent" with his diagnosis of carpal tunnel syndrome and his causation opinion. The right carpal tunnel release surgery did not alleviate the symptoms of pain, grip strength, numbness and tingling in the plaintiff's right hand.
A course of physical therapy ordered by Dr. Young at Sampson Regional Medical Center ended on January 12, 1998 with the plaintiff's dominant right hand having grip strength of only 60% of that she had in non-dominant left hand. Because of the continuing problems with her hands, the plaintiff sought additional medical attention from Dr. Powell and Dr. Young. Based upon these continuing problems, Dr. Young referred the plaintiff for more NCV testing by Dr. Patel on January 7, 1998. While the results of that NCV testing showed "significant improvement" compared with the February 1997 NCV study, the 1998 NCV study was still an "abnormal nerve conduction velocity study suggestive of bilateral sensory carpal tunnel syndrome". The results of the 1998 NCV study were consistent with the patient's symptoms.
With respect to the plaintiff's left hand, whatever improvement in the results of the NCV studies from 1997 to 1998 was the result of the plaintiff's absence from her work at Brooks Brothers from August 7, 1997 to January 7, 1998. Dr. Epling has specifically stated that the plaintiff is not at maximum medical improvement ("MMI") with respect to her left hand as she has not been offered a trial of medication (such as low dose antidepressants or anticonvulsant medication) that has been shown to be effective in treating chronic pain. Dr. Lacin appeared to agree with Dr. Epling's assessment on this point.
The plaintiff has reached MMI with respect to the injury she has suffered to her right hand from the right carpal tunnel syndrome occupational disease she developed at work. As a result of her work-related injury, the plaintiff has suffered a permanent partial impairment of her right hand of 5%.
The opinions of Dr. Powell and Dr. Epling on whether or not plaintiff is able to return to her former job as a "trim and examine inspector" are more credible than those of Drs. Lacin and Young. The opinions of Drs. Powell and Epling are consistent with the objective results of the January 7, 1998 NCV tests which demonstrated that "[b]oth median nerves showed diminished amplitude of the sensory action potential and slowing the sensory nerve conduction velocities." In addition, Dr. Powell's opinion is based upon the results of those NCV studies that he ordered from Dr. Patel, and a medical perspective obtained through a series of clinical examinations that started in February 1997 and has continued on a periodic basis through January, 1999.
It is also clear from the record that Dr. Young had already made up his mind with respect to this issue before he had even seen the results of the surgery that he performed on the plaintiff. In fact, Dr. Young signed a statement on October 7, 1997 more than three (3) weeks before theOctober 29. 1999 surgery rendering an opinion that the plaintiff could return to that same regular job that he had also believed had caused her bilateral tunnel syndrome in the first place. Unlike Dr. Epling, Dr. Young is not trained and board certified in occupational medicine nor did he have the opportunity to view the defendants' videotape exhibit of the job that the plaintiff performed. Lastly, Dr. Young agreed with Dr. Epling's written opinion that: "Given Ms. Bryant's bilateral CTS, typical physical functional limitations should include very limited to no highly forceful or highly repetitive upper extremity work."
As noted above, Dr. Young "strongly disagreed" with Dr. Lacin's opinion that the plaintiffs work as a "trim and examine inspector" was not a "repetitive motion" type job.
With respect to Dr. Lacin, while it is correct that Dr. Lacin was originally designated by the plaintiff for a second opinion under G.S. § 97-27(b), the record clearly shows that Dr. Lacin's view of this case was completely compromised by his statement to Lynn Valenti, the Claims Case Manager for the carrier in this case, that: ". . . very frankly, I have to honor your request in view of the fact that you are the pay or for this consultation."
Because of this view, Dr. Lacin initially rejected the plaintiff's specific request to render an opinion as to whether the plaintiff was at MMI with respect to hand injuries even though that MMI determination was a medical and legal prerequisite for providing the second opinion on the plaintiff's rating that Ms. Valenti did allow Dr. Lacin to provide. The extreme, biased, and unfounded nature of Dr. Lacin's opinions with respect to this case are clearly evident when one notes that he volunteered the view: ". . . that carpal tunnel syndrome was not demonstrated clearly as a work-related illness according to most job descriptions in the local industry [in which the plaintiff was employed]" when that opinion conflicted with the opinions of both of the treating physicians[5], a board certified occupational health physician, the defendant employer's admission of the compensability of the occupational disease in this case, and published literature relevant to that causation issue that Dr. Lacin himself allegedly relied upon. In addition, unlike Dr. Epling, Dr. Lacin has no training or board certification in occupational medicine or any particular medical specialty.
Stephen D. Carpenter, M.S., CRC, is a vocational expert who has testified as such on numerous occasions before the Social Security Administration concerning whether or not a particular person is capable of performing any available jobs in a particular area. He is the only witness who is qualified to render a vocational opinion as to whether the plaintiff is able to perform any alternative employment other than her former position of employment with the defendant employer in light of her age, education, vocational background and training, the compensable physical impairments she has suffered to her hands, and any pre-existing medical impairments that may have pre-dated the August 7, 1997 date of injury for her compensable bilateral carpal tunnel syndrome in this case. Based upon the results and observations made by Mr. Carpenter in his own independent testing of the plaintiff, and his review of the relevant medical and vocational records, it was his unrebutted vocational opinion that the plaintiff is "not employable" in any alternative employment. Therefore, the plaintiff is permanently and totally disabled.
My vote is to reverse.
This 19th day of August 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER